**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dearld Gene DAVIS, a/k/a "Doc" Davis,
and Phillip Martin McFarland,
Defendants-Appellants.**

**Nos. 84–2099, 84–2100.**

United States Court of Appeals,
Tenth Circuit.

Dec. 19, 1985.

Warren Gotcher of Gotcher, Brown &
Bland, McAlester, Okl., for defendant-ap-
pellant Dearld Gene Davis.

Ernest A. Bedford of Ernest A. Bedford, Inc., Tulsa, Okl., for defendant-appellant Phillip Martin McFarland.

Keith A. Ward, Asst. U.S. Atty. (Layn R. Phillips, U.S. Atty. with him on brief), Tulsa, Okl., for plaintiff-appellee.

Before LOGAN and MOORE, Circuit Judges, and BALDOCK, District Judge [*]

JOHN P. MOORE, Circuit Judge.

Defendants-appellants, Dearld Gene "Doc" Davis and Phillip Martin McFarland, were indicted on charges of: (1) conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) traveling interstate with the intent to promote, manage, establish, and carry out a conspiracy to manufacture methamphetamine in violation of the Travel Act, 18 U.S.C. § 1952(a)(3). After a joint jury trial, the defendants were convicted on both counts. Davis was sentenced to concurrent terms of three years on each of the two counts, and McFarland received concurrent terms of two and one-half years for each count. Defendants seek reversal of their convictions, raising these issues in their consolidated appeal: (1) the evidence was insufficient to establish a violation of 18 U.S.C. § 1952(a)(3); (2) the defendants' Fifth Amendment rights were violated by a government agent's comments during grand jury testimony; (3) tape recordings of telephone conversations were admitted as evidence against the defendants in violation of 18 U.S.C. §§ 2515 and 2517(5); and (4) a tape recording introduced by the government should have been excluded due to the presence of unexplained inaudible portions. In addition, Davis argues the district court erred in admitting a note pad belonging to McFarland as evidence against Davis, contending it was improperly authenticated and prejudicial. McFarland argues the district court erred in admitting evidence of Davis's prior crimes in defendants' joint trial due to its prejudicial impact on McFarland's case. For the reasons set forth below, we affirm the convictions.

"Doc" Davis was for several years a self-employed musician and songwriter in Oklahoma. At the time of the events underlying his conviction in this case, he resided in Hartshorne, Oklahoma. Davis became acquainted with defendant McFarland in 1979. From time to time, Davis and his band played at a Hartshorne bar owned by McFarland, whom Davis described as a close friend.

In March 1982, Davis came to the attention of investigators with the Federal Bureau of Investigation (FBI) through a wiretap of a telephone belonging to Richard Riley, a key witness in the case against the defendants. The electronic surveillance was authorized by the United States District Court for the Western District of Oklahoma as part of an extensive investigation of public corruption and narcotics violations. Neither the defendants nor the crimes with which they were charged were listed as targets in that authorization. Initially, government investigators knew Davis only as "Doc." His last name remained unknown until after Richard Riley agreed in April 1982 to cooperate with the government in the investigation of a variety of crimes.[1] As part of his arrangement with the government, Riley agreed to continue his relationship with "Doc" and others and to record telephone conversations relating to their activities. Thereafter, investiga-

---

[*] Honorable Bobby R. Baldock, United States District Judge for the District of New Mexico, sitting by designation.

1. Riley had a rather extensive history of criminal activity, including dealing in stolen automobiles, possession of cocaine, and writing bogus checks. Riley agreed to cooperate in government investigations after the government showed him evidence it had collected with respect to his involvement in the sale of con- trolled dangerous substances. In exchange for Riley's cooperation and his guilty plea to two counts of selling a dangerous controlled substance, the government agreed to drop any remaining charges against him. Riley was sentenced to two years in federal prison and two years of special probation following entry of his guilty plea. At the time of trial in this case, Riley was incarcerated in an Alabama federal prison.

tors learned that Doc's last name was Davis.

At trial, Riley testified that he first met Davis in 1981. At that time, Riley was the president of Midstates Distributing Products in Oklahoma City, a company involved in the distribution of "turkey" drugs.[2] Riley testified that he and Jerry Woods, a friend and business associate, arranged to purchase two pounds of methamphetamine, a dangerous controlled substance, from Davis for $12,000 per pound. Riley claimed that he and Woods never paid for the second pound and that the outstanding debt was the subject of several discussions between Davis and Riley.

Following Riley's agreement to cooperate with the government in April 1982, he recorded several conversations with Davis in which arrangements were made for Davis to obtain chemicals, laboratory equipment, and glassware to manufacture methamphetamine. The government introduced twenty tapes of their conversations into evidence. As part of the arrangements, FBI agents obtained five gallons of phenylpropanolamine from the federal Drug Enforcement Administration (DEA), which were delivered to Davis in June 1982 by an FBI agent posing as Riley's girl friend. At that time, Davis believed that phenylpropanolamine, which is sold legally as a decongestant, was a necessary precursor to the manufacture of methamphetamine.

In September 1982, DEA agent John Coonce was brought into the case and introduced by Riley to Davis as a chemical supplier from Metroplex Chemical in Dallas, Texas. By that time, Davis was aware that methylamine, rather than phenylpropanolamine, was the proper precursor for methamphetamine. On September 10, 1982, in Oklahoma City, Coonce exchanged the phenylpropanolamine in Davis's possession for methylamine. Thereafter, on October 11, 1982, November 19, 1982, and December 9, 1983, Davis and McFarland made trips from Oklahoma to Metroplex in Dallas to obtain glassware, equipment, and chemicals necessary for the manufacture of methamphetamine. Through a prior agreement with the owners of Metroplex, the government videotaped these visits. The videotapes, which were introduced into evidence, indicated the defendants discussed the manufacturing process for methamphetamine with Coonce and others during their visits.

After several months without contact from defendants following their November 1982 trip to Dallas, Coonce telephoned Davis in the summer of 1983. Davis met alone with Coonce in Tulsa in September 1983. Shortly after defendants' third trip to Dallas, Coonce met with Davis and McFarland in a hotel room in Tulsa on December 17, 1983. A tape recording of their conversation, which was introduced into evidence, indicated that most of the meeting involved a discussion about the manufacturing process for methamphetamine. Upon leaving the hotel, Davis and McFarland were arrested.

The government presented the foregoing evidence in support of its theory that defendants conspired, from the time of Davis's initial contacts with Richard Riley in 1982, to establish a laboratory to produce methamphetamine. While it is uncontroverted that no methamphetamine was ever produced, the government argues that the tape recordings of various telephone calls, the videotapes of defendants' three visits to Metroplex Chemical, and testimony regarding meetings between government agents and McFarland and Davis support the inference that defendants were attempting to accumulate the materials necessary to produce methamphetamine.

Davis has continually maintained that he never intended to manufacture methamphetamine or to perform any illegal act. He contends he initiated and pursued his relationship with Richard Riley in 1982 as part of an attempt to investigate the December 1981 shooting death of his music

**2.** Turkey drugs are legal substances, the effects and appearance of which resemble illegal or dangerous controlled substances. In Oklahoma, these substances may be legally sold, as long as they are not misrepresented.

publisher and friend, Jim Ross.[3] Several months prior to his death, Ross, who was involved in the turkey drug business, made angry references to his dealings with Riley. Davis contends he suspected Riley was involved in Ross's death, and Davis therefore attempted to gain Riley's trust and confidence by enlisting his assistance and participation in a purported scheme to manufacture methamphetamine. Davis also testified that, following a trip to Dallas with Ross in July 1981, Ross appeared to be extremely upset about his treatment at the hands of "John," whom Davis assumed Ross visited in Dallas. Davis testified he eventually began to suspect that John Coonce was the subject of Ross's anger. Throughout the trial, Davis and McFarland contended that McFarland became involved in the contacts with Riley and Coonce only to assist Davis in the investigation.

At the end of the government's case, the defendants moved for a judgment of acquittal, which they renewed at the close of all the evidence. After hearing argument on the grounds advanced in support of the motions, the district court denied defendants' motions. On appeal, defendants raise several of the same issues they presented below.

## I.

■ With respect to Count II of the indictment, traveling interstate with the intent to promote, manage, establish, and carry out an unlawful activity in violation of 18 U.S.C. § 1952(a)(3), defendants argue that the evidence presented does not support their convictions.[4] They first contend that they did not engage in an "unlawful activity" within the meaning of § 1952(a)(3), as defined in § 1952(b), because their activities did not rise to the level of a business enterprise, but were merely sporadic or isolated instances.[5] We recognize that business enterprise means a continuing course of conduct rather than sporadic or isolated involvement in a prohibited activity. *Rewis v. United States,* 401 U.S. 808, 811 n. 6, 91 S.Ct. 1056, 1059 n. 6, 28 L.Ed.2d 493 (1971); *United States v. Kendall,* 766 F.2d 1426, 1434 (10th Cir. 1985); *United States v. Corbin,* 662 F.2d 1066, 1072 (4th Cir.1981); *United States v. Pauldino,* 443 F.2d 1108, 1112 (10th Cir.), *cert. denied,* 404 U.S. 882, 92 S.Ct. 212, 30 L.Ed.2d 163 (1971). However, we cannot agree with defendants' characterization of their activities as sporadic. From the evidence in the record, there emerges a picture of an ongoing plan to manufacture illegal drugs which necessitated numerous telephone calls to Richard Riley and John Coonce, three trips to Metroplex Chemical in Dallas, and several meetings in Tulsa to discuss the manufacturing process and to exchange chemicals. The defendants' efforts to obtain the required equipment, chemicals, and information continued over the course of almost two years.

**3.** Ross was shot five times through the door of a Tulsa apartment as he stood outside. The resident of the apartment was questioned regarding the shooting, but was never charged in connection with Ross's death. While the exact circumstances surrounding the shooting are unclear from the record in this case, the record indicates that an investigation determined the homicide to be "justifiable."

**4.** Section 1952:
    (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
    (1) distribute the proceeds of any unlawful activity; or
    (2) commit any crime of violence to further any unlawful activity; or

    (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
    and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

**5.** Section 1952(b):
    As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal exise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

Defendants rely on *United States v. Corbin, supra,* to support the argument that their activities were insufficient to support a Travel Act violation. In that case, the fourth circuit determined no business enterprise existed, despite proof by the government that the defendants possessed 4,700 quaalude tablets and intended to sell them. However, we find *United States v. Corbin* distinguishable from the instant case. The *Corbin* court emphasized the lack of evidence of related past activities or future plans to distribute drugs, as well as the absence of evidence of the source or the price of the drugs, in determining that possession of a large quantity of drugs on one occasion was not a business enterprise. In the present case, however, the government introduced evidence of the prior sale of methamphetamine by Davis and of three trips to Dallas by Davis and McFarland to obtain chemicals and laboratory apparatus. The present case more closely resembles *United States v. Davis,* 666 F.2d 195 (5th Cir.1982), in which the court upheld the finding of a business enterprise where only one illegal drug transaction was proved. There the court emphasized the continuing nature of defendants' relationship in the prohibited activity and the prior involvement of one defendant in illegal drug transactions. *See also United States v. Kendall, supra,* at 1435.

Defendants further argue that this case falls outside the reach of the Travel Act because the act was directed toward organized crime. They point out that there was no evidence of any element of organized crime or of an association of their activities with a larger, ongoing enterprise. While we recognize that the legislative history of the Travel Act indicates it was aimed at combating organized crime, it has been clearly established that its reach is not limited to that end. *Erlenbaugh v. United States,* 409 U.S. 239, 247 n. 21, 93 S.Ct. 477, 482 n. 21, 34 L.Ed.2d 446 (1972); *United States v. Kendall, supra,* at 1435. Where individuals actively undertake interstate travel or the use of interstate facilities in connection with a prohibited activity, even if the interstate component is a minor part of that activity, a Travel Act violation can be sustained. *United States v. Villano,* 529 F.2d 1046, 1053–54 (10th Cir.), *cert. denied,* 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976).

■ Finally, defendants argue for reversal of their Travel Act convictions on the ground that the interstate travel in which they engaged did not end in illegal conduct. They point out that none of the materials purchased at Metroplex Chemical were dangerous controlled substances and all were legally possessed and transported in both Texas and Oklahoma. McFarland testified that he made extensive inquiries to ensure that their purchase of materials at Metroplex was not an illegal activity.

The legality of the immediate object of interstate travel or use of interstate facilities is irrelevant to the determination of coverage by the Travel Act where the interstate activities are part of a larger plan to engage in a prohibited activity. We have previously held that conduct at the end of interstate travel need not be illegal to support a Travel Act violation. *United States v. Falcon,* 766 F.2d 1469, 1478 n. 4 (10th Cir.1985), citing *United States v. Jones,* 642 F.2d 909, 913 (5th Cir.1981), and *United States v. Perrin,* 580 F.2d 730, 736 (5th Cir.1978), *aff'd,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). A Travel Act violation only requires that the interstate travel or use of interstate means be undertaken in furtherance or facilitation of illegal activities. *United States v. Barbieri,* 614 F.2d 715, 718 (10th Cir.1980). Defendants' travel from Oklahoma to Texas on three separate occasions to purchase laboratory glassware and precursor chemicals undeniably facilitated their plan to manufacture methamphetamine.

We have previously held that a Travel Act violation must be supported by proof that defendants (1) traveled or used facilities in interstate commerce; (2) with intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of a prohibited activity; and (3) thereafter attempted to or

did in fact engage in one of the proscribed activities. *United States v. Barbieri, supra,* at 717–18. It is undisputed that the defendants made three interstate trips to purchase chemicals and equipment necessary for the production of methamphetamine. There was sufficient evidence in the form of videotapes of their visits and tapes of numerous telephone calls to establish their intent to carry on an illegal activity. After their visits to Dallas, defendants contacted and met with Coonce to discuss the process for manufacturing methamphetamine. This evidence clearly supports the jury's verdict of a Travel Act violation.

## II.

■ Defendants argue that violation of their Fifth Amendment rights mandates reversal of their convictions on both counts. Agent Coonce, while testifying before the grand jury, commented on the absence of defendants from the grand jury proceedings despite the fact they had been invited to attend.[6] Defendants contend his testimony constitutes a impermissible reference to the invocation of their Fifth Amendment right to remain silent in the face of accusations against them.

We agree with the government that *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), is dispositive of this issue. In *Calandra,* the Supreme Court repeated the general rule that an indictment which is valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of incompetent or inadequate evidence. *Id.* at 344–45, 94 S.Ct. at 618. *See also Lawn v. United States,* 355 U.S. 339, 349–50, 78 S.Ct. 311, 317–18, 2 L.Ed.2d 321 (1958); *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); *Holt v. United States,* 218 U.S. 245, 247, 31 S.Ct. 2, 4, 54 L.Ed. 1021 (1910). The Court has repeatedly recognized the broad power of properly constituted and unbiased

grand juries to institute criminal proceedings, stating that "neither the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act." *Costello v. United States, supra,* 350 U.S. at 362, 76 S.Ct. at 408. Even an indictment based upon evidence obtained in violation of a defendant's Fifth Amendment rights is nevertheless valid. *United States v. Calandra, supra,* 414 U.S. at 346, 94 S.Ct. at 619; *Lawn v. United States, supra,* 355 U.S. at 349–50, 78 S.Ct. at 317–18. In the present case, there is no indication that the indictment against defendants was invalid on its face or that it was returned by a biased or improperly constituted grand jury.

In support of their argument regarding a constitutional violation, defendants repeatedly emphasize that the Fifth Amendment privilege against compulsory self-incrimination extends to grand jury proceedings. We do not quarrel with defendants' assertion. We recognize that the broad powers of the grand jury are limited by its inability to compel a witness to incriminate himself. *United States v. Calandra, supra,* 414 U.S. at 346, 94 S.Ct. at 619; *Kastigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). However, the record in this case does not indicate that defendants were compelled in any way by the grand jury to present incriminating testimony or evidence in violation of the Fifth Amendment. The violation defendants allege consisted of a comment that after stating their desire to present their story to the grand jury, defendants were not present at the proceedings. There is no indication in the record that defendants invoked their privilege against self-incrimination before the grand jury. We do not think that their decision to absent themselves from the proceedings,

6. The pertinent section of Coonce's testimony reads as follows:

Coonce: You know, they told me after I arrested them and they had their hearing that they wanted to come in here to the grand jury and explain why they did all of this. I said, well, have at it; but they are not here today.

Foreman of the grand jury: Were they invited?

Coonce: Sure.

by itself, constitutes an invocation of their Fifth Amendment rights.

Even if defendants' absence from the grand jury proceedings could be considered an invocation of their Fifth Amendment rights, we are not convinced that Agent Coonce's comment rises to the level of an impermissible comment on their post-invocation silence. The Fifth Amendment bars the use against a defendant of silence maintained after receipt of governmental assurances of the right to remain silent. *Anderson v. Charles*, 447 U.S. 404, 407–08, 100 S.Ct. 2180, 2181–82, 65 L.Ed.2d 222 (1980); *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982). *Miranda* warnings, by informing a person of his right to remain silent, implicitly assure him that his silence will not be used against him. *Anderson v. Charles, supra*, 447 U.S. at 407–08, 100 S.Ct. at 2181–82. *United States v. Massey, supra*, at 1353. The record does not indicate at what point in time defendants were given *Miranda* warnings, and an arrest, by itself, cannot be considered governmental action which implicitly induces a defendant to remain silent. *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982). In the absence of an indication that affirmative assurances were given, comment on post-arrest silence does not violate due process. *Id.* at 606–7, 102 S.Ct. at 1311–12.

In light of the foregoing, we conclude there is no Fifth Amendment ground for reversal of defendants' convictions. However, we are constrained to note that the responsibility for preventing improper grand jury testimony rests with the government. That responsibility is particularly important in light of the secrecy of grand jury proceedings. We appreciate the district court's concern about the lack of mechanism to redress the violation of a defendant's constitutional rights by improper grand jury testimony, but we do not think that this case requires us to address that problem. Coonce's comments before the grand jury do not rise to the level of a constitutional violation. Furthermore, the defendants do not contend that the alleged violation either destroyed the impartiality of the grand jury or deprived them of a fair trial. Where there is no hint of such deprivations, the potential harm in permitting challenges to facially valid indictments outweighs the benefits. As the Supreme Court has noted, a rule permitting defendants to challenge indictments on the ground that they are not supported by competent or sufficient evidence

> would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.

*United States v. Costello, supra*, 350 U.S. at 364, 76 S.Ct. at 409.

### III.

Defendants contend the district court erred in admitting into evidence tape recordings obtained in violation of 18 U.S.C. §§ 2515 and 2517(5). Defendants point out that Davis became known to the government agents only through a previously authorized wiretap of Richard Riley's telephone. Neither defendants nor the crimes with which they were charged were included as targets in the authorization for that wiretap. Because the government failed to obtain additional authorization for the disclosure of the wiretaps in this case, as required by § 2517(5), defendants argue that all of the wiretaps and subsequently discovered evidence against defendants were admitted in violation of § 2515. Defendants contend that essentially all of the evidence introduced against them was derived from an improperly authorized wiretap and was, therefore, improperly admitted. These contentions are specious.

The government did not attempt to introduce any of the tapes of conversations which occurred prior to Riley's agreement to cooperate with the government on April

19, 1982. All of the tapes admitted into evidence were recorded with Riley's consent or by Riley himself. Where the person intercepting a conversation is a party to the conversation or a party consents to such interception, 18 U.S.C. § 2511(2) provides that the interception is lawful. Therefore, the communications admitted into evidence were lawfully intercepted.

The fact that Davis first became known to government agents as "Doc" prior to Riley's consent to the interception of telephone conversations does not compel a different result. Even if all the evidence subsequently developed against the defendants can be characterized as evidence "derived from" a wiretap authorized for purposes unrelated to defendants or the crimes with which they were charged, a proposition we find untenable, the government's failure to secure additional authorization under § 2517(5) does not require suppression of that evidence. The sanction of suppression is limited to cases in which the government has illegally *intercepted* evidence. *See* 18 U.S.C. § 2518(10); *United States v. Cardall*, 773 F.2d 1128 (10th Cir.1985); *United States v. Horton*, 601 F.2d 319 (7th Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *Fleming v. United States*, 547 F.2d 872 (5th Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977). In the present case, the evidence leading to the discovery of Davis's name was not illegally intercepted. We have previously held a suit for damages as provided by 18 U.S.C. § 2520, rather than suppression of evidence, to be the exclusive remedy for unauthorized *disclosures* of wiretaps in violation of § 2517. *United States v. Cardall, supra*, at 1134. Therefore, the district court properly admitted the tapes of wiretaps and other evidence obtained subsequent to the discovery of Davis's existence.

### IV.

Defendants contend the district court erred in admitting one of the twenty tape recorded telephone conversations into evidence due to the presence of unexplained "bleeps" or unintelligible segments in the tape. Defendants argue that the unintelligible segments rendered the tape untrustworthy such that admission by the trial court was an abuse of discretion. We disagree.

We have previously held that a recording is admissible unless the inaudible portions are so substantial as to render untrustworthy the recording as a whole. *United States v. Watson*, 594 F.2d 1330, 1335–36 (10th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979); *United States v. Brinklow*, 560 F.2d 1003, 1011 (10th Cir.1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978); *United States v. Jones*, 540 F.2d 465, 470 (10th Cir.1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977). Admission is especially appropriate "where a witness who heard the statements also testifies and the recording gives independent support to his testimony." *United States v. Jones, supra*, at 470. Here, the trial judge listened to the tape in camera before ruling on its admissibility. Riley, who was a party to the conversation, testified that the recorded conversation was as he remembered it. While he could not explain the presence of the unintelligible areas, he testified that the tape did not appear to have been altered. Agent Coonce testified regarding the chain of custody maintained with respect to the tape after Riley delivered it to him. In the absence of evidence that the tape had been altered or that the unintelligible portions were substantial, we conclude the trial court did not abuse its discretion in admitting the tape into evidence.

### V.

At trial, Davis objected to the admission of a note pad, which was taken from McFarland at the time of defendants' arrest, on the ground that it was improperly authenticated and prejudicial. After the note pad was admitted, Davis requested a cautionary instruction that the evidence should be considered with respect to McFarland only. When his request was

denied by the trial judge, Davis moved for severance, contending the admission of hearsay evidence obtained from a codefendant after the defendants' arrest and, therefore, after any conspiratorial activity, prejudiced his case. The district judge denied the severance motion.

We conclude the note pad was properly admitted against both defendants. We therefore affirm the district court's finding that severance of defendants' trials was not warranted. Fed.R.Evid. 901(a) provides that the requirement for authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." McFarland identified the note pad as his, testifying that it was a record of money owed him. With the exception of the word "gram" on one page of the note pad, McFarland identified all of the handwriting as his. We do not believe the fact that the author of one word of many in the note pad was unknown makes the authentication of the note pad faulty under Fed.R.Evid. 901. Through McFarland's testimony, the jury was made aware that McFarland denied writing "gram" as it appeared in the note pad. The presence of the word goes to the weight, rather than admissibility, of the evidence.

The fact that the note pad was taken from McFarland after defendants' arrest is irrelevant to the question of admissibility of the evidence against Davis. The record indicates the note pad was dated November 11, 1983, at which time defendants were allegedly engaged in their conspiracy to manufacture methamphetamine. The note pad was seized from McFarland immediately after a meeting in which Davis and McFarland discussed at length the manufacturing process for methamphetamine. It contained references to quantities and corresponding prices. The note pad was relevant as circumstantial evidence of McFarland's knowledge and familiarity with drug transactions. Therefore, its probative value outweighed the danger of prejudice, and it was properly admitted. Fed. R.Evid. 401, 403. *See also* Fed.R.Evid. 801(d)(2)(E); *United States v. Federico,* 658 F.2d 1337, 1341–42 (9th Cir.1981).

## VI.

■ Defendant McFarland argues the district court erred in admitting evidence of sales of methamphetamine by Davis to Riley and his friend, Jerry Woods, which allegedly occurred prior to McFarland's involvement in the events leading to the indictment in this case. McFarland contends the district court's failure to caution the jury that the evidence was to be considered against Davis only at the time the evidence was introduced constitutes reversible error. We disagree.

Under Fed.R.Evid. 404(b), evidence of crimes not charged in the indictment is relevant to prove intent and plan. *United States v. Barbieri, supra,* at 719; *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir.1980), *cert. denied,* 449 U.S. 1093, 101 S.Ct. 890, 66 L.Ed. 822 (1981). Matters of intent and plan are particularly relevant in any conspiracy case. *United States v. Herbst,* 565 F.2d 638, 641 (10th Cir.1977). Evidence of past sales of methamphetamine by Davis to Riley was relevant to show Davis's intent to manufacture methamphetamine. In light of cautionary instructions given to the jury that the evidence was relevant to Davis only, we find that its probative value outweighed the danger of prejudice; therefore, the district court did not abuse its discretion in admitting the evidence. Fed.R.Evid. 403. *See also United States v. Barbieri, supra,* at 719.

The fact that a cautionary instruction was not given at the time the evidence was introduced, as McFarland requested, does not compel a different result. The record reveals the district court declined to give the instruction at that time because of the potentially serious prejudicial effect on Davis of emphasizing at that time that the alleged crimes were his alone. However, at the close of all of the evidence, the district judge specifically instructed the jury that evidence of alleged past transactions of Davis should be considered only in

848

his case. The instruction was sufficient to cure any prejudicial impact of the evidence on McFarland. The district court did not abuse its discretion in delivering the proper cautionary instruction at the close of the evidence.

Affirmed.