57 F.3d 1081
NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
George Jim CONWAY, Defendant-Appellant.
 (Proposed) No. 93-8124
(D.C. No. 92-CR-128)
 United States Court of Appeals, Tenth Circuit.
 June 8, 1995.
 
 1
 Patrick J. Crank, Assistant U.S. Attorney, (David A. Kubichek, Assistant U.S. Attorney with him on the brief), Office of the United States Attorney, Casper, WY, for Plaintiff-Appellee.
 
 
 2
 Michael H. Reese of Wiederspahn, Lummis & Liepas, Cheyenne, WY, for Defendant-Appellant.
 
 ORDER AND JUDGMENT[1]
 
 3
 Before HENRY and McKAY, Circuit Judges, and KANE[2], Senior District Judge.
 
 
 4
 Defendant George Jim Conway appeals his conviction and sentence on charges of conspiracy to commit mail fraud, wire fraud, and money laundering under 18 U.S.C. 371. He asserts multiple instances of error by the district court in his trial and sentencing. We affirm.
 
 Facts
 
 5
 Mr. Conway and two co-defendants, Steven Emery and E. LaVay McKinley, were tried together on charges stemming from their involvement in illegal banking and investment schemes. Between April 1990 and December 1992 all three were involved in a constellation of business ventures based in the Caribbean and operating under the name World Fidelity Bank (WFB). In fact, WFB was never licensed to conduct banking business anywhere.
 
 
 6
 WFB, the brainchild of Mr. McKinley, made most of its money by selling bogus "certificates of deposit" that promised a rate of return considerably higher than that available for domestic investments. Some of this money was paid out to earlier investors; some was lost in bad investments; some was simply pocketed by the defendants. However, WFB sent its investors, many of whom were elderly and targeted through their churches, monthly "earnings" statements. WFB also produced brochures, disseminated by WFB salesmen, misrepresenting what was being done with the investors' money.
 
 
 7
 Evidence at trial indicated that Mr. Conway started as a salesman for "CUP/ISSI," another of Mr. McKinley's enterprises that offered unrealistically remunerative investments packaged to appeal to investors' religious sentiments. All money received by CUP/ISSI was channeled to WFB. Mr. Conway also sold approximately $400,000 in WFB certificates of deposit between May and August of 1992, representing to investors that WFB would become a "class A bank" by "next week." Rec. vol. 15, at 78.
 
 
 8
 In addition to his duties as salesman, Mr. Conway had significant responsibility for keeping records on the investors, Rec. vol 21, at 84-89, creating monthly statements for their benefit, Id. at 110, and distributing the actual certificates of deposit. Rec. vol. 15, at 12. These certificates themselves falsely stated that they were issued by a bank in Grenada and that the funds were kept on deposit there. Rec. vol. 9, at 110-11.
 
 
 9
 In October 1992, the FBI secretly videotaped two meetings attended by WFB participants, including Mr. Conway, and an undercover FBI agent posing as an accountant for a Colombian drug cartel. The purpose of the meetings was to arrange a money laundering scheme that would net WFB the five million dollars it needed to pay off its investors. Soon after the second meeting, Mr. Conway, Mr. McKinley, and others were arrested by Bahamian authorities for failing to pay their hotel bill. They were deported to Miami, where they were arrested by the FBI.
 
 
 10
 Mr. Conway was then tried on charges of conspiracy to commit mail fraud, wire fraud, and money laundering under 18 U.S.C. 371. Before trial Mr. Conway moved for severance of his trial and, under United States v. James, 590 F.2d 575, 581 (5th Cir.) (en banc), cert. denied, 442 U.S. 917 (1979), for exclusion of the statements of his coconspirators. The district court denied both motions. Mr. Conway also moved to suppress evidence seized on his return to Miami and to suppress the videotapes of the money laundering meetings. Those motions, too, were denied, and Mr. Conway was ultimately convicted. At sentencing, the district court calculated a base offense level of 23, found that upward deviations were justified, and imposed a sentence of 60 months.
 
 Discussion
 
 11
 We turn first to Mr. Conway's contention that the district court erred in admitting the statements of Mr. Conway's coconspirators. We review the district court's decision for abuse of discretion, United States v. Harmon, 918 F.2d 115, 117 (10th Cir.1990), and affirm.
 
 
 12
 Before trial, the district court held a James hearing to evaluate the proffered statements, which were contained on audio tapes of telephone conversations and the video tapes of the October 1992 meeting. Such statements are admissible against a defendant under Fed.R.Evid. 801(d)(2)(E) if the court finds by a preponderance of the evidence that a conspiracy existed, that both the declarant and defendant were members thereof, and that the statements were made during the course of and in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 173 (1987). The district court found that the government had satisfied its burden as to each of the elements and admitted the statements. Mr. Conway argues on appeal that the government's independent evidence was clearly insufficient, and that in any event the statements were irrelevant insofar as they concerned money laundering, not investment fraud.
 
 
 13
 The evidence was not insufficient, and the statements were relevant. In addition to the audio and video tapes themselves, the government elicited testimony from Mr. Ken Gassen, a Wyoming law enforcement officer, who provided details of conversations and phone logs tying Mr. Conway to WFB's illegal investment activities. Rec. vol. 53, at 59. The fact that some of this testimony was controverted by defense witnesses at trial is irrelevant to its sufficiency during the James hearing. Similarly, it is irrelevant that the proffered out-of-court statements involved not investment fraud, but money laundering, since it was established that the conspiracy was trying to hide the former crime by means of the latter. We conclude that the district court did not err in its decision to admit the statements.[3]
 
 
 14
 Mr. Conway argues next that his trial should have been severed from that of his codefendant E. LaVay McKinley. He contends that his defense--that he was another innocent victim of Mr. McKinley--was fatally damaged by being presented alongside Mr. McKinley's own defense, which was that WFB was legitimate. He also contends that Mr. McKinley could have testified in his behalf if the trials had been separate.
 
 
 15
 We review a district court's denial of a motion for severance for abuse of discretion and prejudice to the defendant. United States v. Evans, 970 F.2d 663, 675 (10th Cir.1992), cert. denied 113 S.Ct. 1288 (1993). We note first that there was no logical inconsistency between the two defenses. Stripped of the rhetoric of victimhood, Mr. Conway's defense consisted merely of the claim that he was unaware of the illegal object of the conspiracy. That defense is completely consistent with Mr. McKinley's claim that nothing illegal occurred. Second, we locate nothing in the record, beyond Mr. Conway's assertion, to indicate that Mr. McKinley would have testified in Mr. Conway's behalf at a separate trial. We therefore conclude that there was no abuse of discretion in the court's decision not to sever.
 
 
 16
 Mr. Conway's next argument is that evidence seized on his return from the Bahamas to Miami should have been suppressed. He contends that his arrest in the Bahamas by Bahamian officials was the result of such close cooperation with the FBI that United States constitutional protections should have applied at that point. Since he was not read his Miranda rights until he was arrested by the FBI in Miami, Mr. Conway contends that evidence seized from his luggage at the airport should have been inadmissible.
 
 
 17
 The question is whether Mr. Conway's arrest in the Bahamas was in reality an arrest by the United States government. It was not. Although the record reveals some coordination between the FBI and Bahamian officials, Rec. vol. 26, at 113-16, there was nothing in the arrangement that would lead us to expect that another sovereign country should have read Mr. Conway a list of Miranda rights upon arresting him. See Stonehill v. United States, 405 F.2d 738, 743 (9th Cir.1968) (requiring that participation by United States agents be substantial for the Fourth Amendment to apply), cert. denied, 498 U.S. 962 (1990).
 
 
 18
 Mr. Conway next argues that the evidence was insufficient to convict him of conspiracy. Evidence is sufficient to support a criminal conviction if, viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Jenkins, 904 F.2d 549, 553 (10th Cir.), cert. denied, 482 U.S. 962 (1990). Here, the only element of conspiracy at issue is the defendant's knowledge of an illegal aim. We conclude that a reasonable trier of fact could have found, if only from the misrepresentations he made to investors and his participation in the money-laundering scheme, that Mr. Conway was aware of WFB's illegality.
 
 
 19
 Finally, Mr. Conway raises multiple issues regarding his sentence: (1) he did not cause the entire loss attributed to him by the government; (2) his victims were not unusually vulnerable; (3) he did not organize or lead the conspiracy; (4) he was in fact a minor participant; and (5) he did not abuse a position of trust. All of these involve factual determinations, which we review for clear error. United States v. Lowder, 5 F.3d 467, 470 (10th Cir.1993).
 
 
 20
 As to his level of participation and the amount of the loss Mr. Conway caused, U.S.S.G. 3B1.1, 3B1.2, and 2F1.1, it was entirely reasonable for the court to conclude that he was a central participant and to attribute to him the full amount of the loss, which by his own videotaped admission came to five million dollars. We also conclude that the court did not err in finding, under U.S.S.G. 3A1.1 and 3B1.3, that his victims were unusually vulnerable and that he abused a position of trust in defrauding them. Mr. Conway represented himself as a securities and investment counselor. Rec. vol. 16, at 28-29. He specialized in using his church connections to sell securities to highly religious investors, some of whom were old, or sick, or both. Rec. vol. 15, at 4-25. Thus, the court did not abuse its discretion with respect to either enhancement. See Lowder, 5 F.3d at 472 (upholding vulnerable victim enhancement where victims were inexperienced, elderly, and particularly reliant on funds entrusted to defendant).
 
 
 21
 The judgment and sentence of the district court are AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order. 151 F.R.D. 470 (10th Cir.1993)
 
 
 [2]
 Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation
 
 
 [3]
 Mr. Conway renewed his objections to the video tapes at trial on the grounds that he had not consented to being taped and the government had not obtained a warrant to do so. This argument overlooks the fact that one party on the tape--the undercover agent--was always present and did consent. United States v. Davis, 780 F.2d 838, 846 (10th Cir.1985)