2002 WY 96

**Deborah HENSLEY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**Deborah Hensley, Appellant (Defendant),**

v.

**The State of Wyoming, Appellee (Plaintiff).**

**Nos. 00–174, 01–90.**

Supreme Court of Wyoming.

June 26, 2002.

Kenneth M. Koski, State Public Defender; Marion Yoder, Senior Assistant Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Assistant Appellate Counsel, Representing Appellant in Case No. 00–174.

Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Devon Coleman, Interim Faculty Director of the Prosecution Assistance Program; Vicki K. Johnston, Student Intern for the Prosecution Assistance Program, Representing Appellee in Case No. 00–174.

Kenneth M. Koski, State Public Defender; Marion Yoder, Senior Assistant Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Assistant Appellate Counsel, Representing Appellant in Case No. 01–90.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D.

Michael Pauling, Senior Assistant Attorney General; T. Alan Elrod, Assistant Attorney General, Representing Appellee in Case No. 01–90.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

KITE, Justice.

[¶1] After being convicted of conspiracy to deliver and delivery of methamphetamine, Deborah Hensley learned the state had failed to disclose evidence she could have used to impeach the prosecution's primary witness. Ms. Hensley filed a motion for a new trial pursuant to *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which the trial court denied. The related case of *Davis v. State*, 2002 WY 88, 47 P.3d 981 is controlling and dictates we reverse and remand for a new trial because of the prosecution's failure to disclose potentially exculpatory evidence. We also consider and affirm the trial court's admission of the drug transaction tape as this question will likely recur in any new trial.

## ISSUES

[¶2] The issues we will address are rephrased as follows:

1. Did the trial court err in denying Ms. Hensley's motion for a new trial?

2. Did the trial court abuse its discretion when it admitted the entire tape of the drug transaction into evidence?

## FACTS

[¶3] This appeal involves the same controlled methamphetamine buy as *Davis*, 2002 WY 88, 47 P.3d 981 in which we reversed Rex Davis' conviction. Although the cases were prosecuted separately, Mr. Davis and Ms. Hensley faced identical charges. Mr. Davis challenged the denial of his motion for a new trial based on the same *Brady* violation as Ms. Hensley alleges occurred in her case. *See Davis*, 2002 WY 88, ¶1, 47 P.3d 981.

[¶4] In 1998, the Department of Criminal Investigation (DCI) tape recorded Roberta Morris selling methamphetamine to a DCI confidential informant on three occasions. Ms. Morris subsequently agreed to work as an informant for DCI because she was told DCI would put in a good word for her with the prosecutor if she was officially charged on these methamphetamine sales.

[¶5] On June 3, 1999, DCI arranged for Ms. Morris to go to Richard Wilkie's [1] residence as a DCI informant to purchase methamphetamine. In order to prepare her for the controlled buy, the DCI agents searched her car and person, wired her with recording equipment to allow the transaction to be recorded, and gave her money to buy an "eightball" [2] of methamphetamine. The DCI agents then positioned themselves around Mr. Wilkie's residence in order to monitor the transaction.

[¶6] When Ms. Morris arrived on Mr. Wilkie's street, she saw him visiting with neighbors at their house. She approached Mr. Wilkie and asked him to "call and see if he could find any meth." Mr. Wilkie made two telephone calls to an unidentified person and left messages. For approximately forty-five minutes, he and Ms. Morris wandered back and forth between the neighbors' house and Mr. Wilkie's place. Ms. Morris testified that one of the neighbors and Mr. Wilkie smoked marijuana during that time but she did not. The tape recording of the encounter was difficult to understand because of disruptive background noise from conversations, barking dogs, a television, and extremely loud music. Mr. Wilkie made a third call and purportedly spoke with Ms. Hensley. Then he and Ms. Morris waited for Ms. Hensley and her friend—Mr. Davis—to arrive.

[¶7] Ms. Hensley and Mr. Davis arrived in a pickup truck, and Mr. Wilkie and Ms. Morris walked to the curb in front of Mr. Wilkie's house to meet with them. Ms. Morris spoke to Ms. Hensley at the door of the truck. Two women's voices can be heard on the tape recording. Ms. Morris identified

---

1. Mr. Wilkie died prior to Ms. Hensley's trial.

2. Ms. Morris testified that an "eightball" was short for one-eighth of an ounce of methamphetamine.

her voice as the voice requesting a "ball" and Ms. Hensley's voice as the voice responding they had a gram. Ms. Morris asked how much, and Ms. Hensley replied, "eighty." Although Ms. Morris testified Mr. Davis told Ms. Hensley how to respond, his voice cannot be heard on the tape. After the interchange, the women and Mr. Wilkie went into the house to complete the transaction.

[¶ 8] The DCI agents ultimately arrested Ms. Hensley and Mr. Davis and charged each with one count of delivery of methamphetamine and one count of conspiracy to deliver methamphetamine. The state tried them separately. Ms. Morris was the only witness to testify regarding the alleged drug buy because Mr. Wilkie died before the trial and neither Ms. Hensley nor Mr. Davis testified.

[¶ 9] The primary issue at trial was. Ms. Hensley's objection to the admission of the tape recording of the buy on the basis that it included the neighbors' and Mr. Wilkie's voices and they were unavailable at trial. Ms. Hensley argued, therefore, the admission of the tape violated the hearsay rule and her constitutional right to confront witnesses. The prosecution contended the tape was akin to a crime scene photograph and merely used to corroborate Ms. Morris' testimony regarding the controlled buy. The defense presented the theory, through cross-examination, that Ms. Morris was not credible because she was a drug user and former drug dealer who knew how to, and did, manipulate the recording device by creating loud background noise to cover up her own drug use during the controlled buy. The trial court admitted the tape into evidence, ruling it was not offered to prove the truth of the matters asserted by the unavailable witnesses and was the best evidence of what occurred at the scene.

[¶ 10] In order for the state to prevail, the jury had to be convinced Ms. Morris was a reliable and credible informant. The prosecution sought to bolster Ms. Morris' credibility through the testimony of a veteran Green River police department officer who worked concurrently as a DCI agent. The agent testified regarding his experience with confidential informants and how Ms. Morris' work compared to others:

Q. How many CIs have you personally worked with?

A. Probably—probably about ten in the last year. Excuse me, the last year and a half. Almost two years now, I would say ten.

Q. You heard [Ms. Morris] testify, and in fact, she agreed with [the defense's] question regarding how many buys she had made for DCI, and I think that it was somewhere around five, five to ten?

A. Yes.

Q. Do you know how many buys [Ms. Morris] has personally made?

A. It's closer to—between 10 and 12. I'm not positive. It was between 10 and 12, I believe. Definitely more than 5.

Q. In your experience, does your average CI do that many buys?

A. No. She's probably done the best job so far since I've been here.

Q. In terms of number of buys?

A. And quality and numbers and keeping in touch, yes.

In a further effort to reinforce Ms. Morris' credibility, the prosecution elicited testimony from her that she was trying to address her methamphetamine addiction and extricate herself from the drug lifestyle. Ms. Morris testified that she used methamphetamine only once during the two years she worked for DCI. The jury convicted Ms. Hensley, and the trial court sentenced her to concurrent four- to eight-year prison terms on each count with credit for presentence confinement.

[¶ 11] Shortly after Mr. Davis' sentencing was reported in the local newspaper, Charlotte Shepard, formerly known as Charlotte Powell,[3] an informant for the Rock Springs police department and former DCI informant, contacted Mr. Davis' defense counsel and told him she had taped a conversation with Ms. Morris in February of 2000, approximately two months before Ms. Hensley's

---

**3.** Consistent with the references in *Davis,* we shall refer to Ms. Shepard as Ms. Powell throughout the remainder of this opinion.

trial, in the context of a murder investigation. Ms. Morris was not a suspect in the murder case but was thought to have some relevant information.[4] Ms. Powell advised the defense that Ms. Morris was recorded on the tape using narcotics. On this evidence, the defense filed a motion for a new trial alleging a *Brady* violation.

[¶ 12] At the hearing on the motion, the defense contended Ms. Morris could be heard on Ms. Powell's tape consuming methamphetamine which proved, contrary to her trial testimony and the prosecution's trial contentions, she was actively using illegal drugs at the time of trial. Ms. Powell testified that DCI personnel were angry with her when they learned she had worn a wire to record her conversation with Ms. Morris. She stated that she went to Ms. Morris' apartment where she saw methamphetamine and drug paraphernalia. She also testified that both her conversation with Ms. Morris about the murder investigation and sounds of Ms. Morris and another person consuming methamphetamine were recorded on the audio tape. She also had observed Ms. Morris using drugs on several other occasions after February 2000. Ms. Powell further testified Ms. Morris told her, after Mr. Davis' trial, that Mr. Davis had not been involved in the drug transaction but she felt compelled to testify against him because of her desire to have DCI assist her in retaining custody of her children. Ms. Powell claimed Ms. Morris told her, again contrary to Ms. Morris' trial testimony, she knew how to manipulate the recording device to prevent DCI from hearing what actually occurred during a controlled buy and had provided perjured testimony regarding her drug use.

[¶ 13] The trial court determined that no *Brady* violation had occurred and denied Ms. Hensley's motion for a new trial. This appeal followed.

## DISCUSSION

### A. *Brady* Violation Analysis

[¶ 14]

We must determine ... whether the government's failure to disclose evidence favorable to the defendant deprived the defendant of a fair trial under *Brady* by considering whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." [*Strickler v. Greene*, 527 U.S. 263,] 290, 119 S.Ct. [1936,] 1952, 144 L.Ed.2d 286 [ (1999) ] (quoting *Kyles* [*v. Whitley* ], 514 U.S. [419,] 435, 115 S.Ct. [1555,] 1566, 131 L.Ed.2d 490 [ (1995) ] ). In order to establish a *Brady* violation, a defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. We have previously decided that the materiality of withheld evidence and its possible effect on the outcome of the trial are mixed questions of fact and law. Generally, the denial of a motion for a new trial is reviewed for an abuse of discretion; however, a claim of failure to disclose evidence in violation of *Brady* is properly reviewed de novo.

*Davis*, 2002 WY 88, ¶ 16, 47 P.3d 981 (some citations omitted).

[¶ 15] The analysis of the *Brady* issue in Ms. Hensley's trial is indistinguishable from our analysis of the same issue in *Davis*. Therefore, our decision in *Davis* governs and provides in relevant part:

The first element requires that we determine whether [the defendant] showed that the prosecution suppressed evidence. [The defendant] presented testimony showing that DCI knew about the Powell tape before trial. When the prosecution learned about it after trial, it did disclose. A prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. *Kyles*, 514 U.S. at 437–38, 115 S.Ct. at 1567. In this case, the Powell tape is admissible (FN3)[5] to

---

4. Mr. Wilkie's death was unrelated to the murder investigation.

5. Footnote three reads:

"Prior inconsistent statements by a witness are admissible under W.R.E. 613(b): '(b) Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the

impeach Morris' testimony at [the defendant's] trial that she had used drugs two months before trial when she had actually used drugs more recently and to impeach the DCI agents' testimony vouching for Morris'· credibility. The discovery of the Powell tape directly led to the defense's discovery of Powell's post-trial conversation with Morris where Powell alleges that Morris said she had intentionally shut off the tape recorder, and stated different motives for testifying. . . . Powell's version of Morris' post-trial statements contradicts Morris' trial testimony and could potentially be recognized as improperly suppressed *Brady* evidence. *See Paradis v. Arave,* 240 F.3d 1169, 1178–79 (9th Cir.2001). These post-trial contradictions obviously could not have been disclosed before trial, however, and, because they were not in existence before trial, cannot be part of an analysis as to whether the suppression of the Powell tape was a *Brady* violation. *Strickler,* 527 U.S. at 283, 119 S.Ct. at 1949. Nevertheless, by showing that the State failed to disclose the Powell tape which did exist before trial, [the defendant] has met [her] burden on this element.

The next element, that [the defendant] prove the evidence would have been favorable to [her], is also established by the record. Favorable evidence includes impeachment evidence, and the undisclosed Powell tape of Morris' use of drugs is impeachment evidence, particularly so when her use was at a time different than

that to which she had testified. The Powell tape is also impeachment evidence because, at trial, the defense had no evidence and could only suggest that Morris' motives were not as pure as she testified. Further, the defense at trial had no evidence with which to challenge the prosecution's bolstering (FN4) [6] of Morris' credibility with the testimony of [the] DCI agent[ ] who vouched for Morris' credibility [stating she was the best CI he had worked with both as to quality and quantity of her work]. (FN5) [7] In the hands of defense counsel, the Powell tape's disclosure indicating that DCI knew that Davis was engaging in illegal activities would have been most useful for challenging all of this testimony.

The final element requires that we focus on the materiality of the undisclosed evidence, mindful that favorable evidence is material if "its suppression undermines confidence in the outcome of the trial." [*United States v.*] *Bagley,* 473 U.S. [667,] 678, 105 S.Ct. [3375,] 3381, 87 L.Ed.2d 481 [ (1985) ]. In *Kyles,* the Court further reviewed the meaning of materiality as it relates to the final result of the trial: "*Bagley's* touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is **not** whether the defendant would **more likely than not** have received a different verdict with the evidence, but whether in its absence he received a fair

same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).' " *Monn v. State,* 811 P.2d 1004, 1006 (Wyo. 1991).
*Davis,* 2002 WY 88, ¶ 17 n. 3, 47 P.3d 981.

**6.** Footnote four reads:
"The jury is charged with resolving the factual issues, judging the witnesses' credibility, and ultimately determining whether the accused is guilty or innocent. *Gayler v. State,* 957 P.2d 855, 860 (Wyo.1998); *Zabel v. State,* 765 P.2d 357, 362 (Wyo.1988). A witness may not, therefore, vouch for the credibility of another witness or a victim. *Gayler,* 957 P.2d at 860; *Curl v. State,* 898 P.2d 369, 373–74 (Wyo. 1995)." *Newport v. State,* 983 P.2d 1213, 1215 (Wyo.1999). Whether [the defendant] can be

heard on the tape making the precise statements that Morris alleged [she] made is a question of fact for the jury to determine.
*Davis,* 2002 WY 88, ¶ 18 n. 4, 47 P.3d 981.

**7.** Footnote five reads in pertinent part:
In its presentation of its case, the prosecution established Morris as an informant whom the jury could find trustworthy in several ways. First, Morris testified that her motives for acting as a DCI informant were to cooperate for favorable treatment regarding her own arrests for drug violations; to avoid the possibility of losing custody of her children; and to escape her life as a drug addict in the drug world although she forthrightly disclosed that since becoming a DCI informant, she had used drugs once two months before trial. Second, a DCI agent testified and vouched for Morris' credibility.
*Davis,* 2002 WY 88, ¶ 18 n. 4, 47 P.3d 981.

trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381) (emphasis added).

In *Strickler*, the Court distinguished between finding a "reasonable probability" that the outcome might have been different requiring a reversal and finding a "reasonable possibility" requiring that the conviction be affirmed. 527 U.S. at 291, 119 S.Ct. at 1953. The dissent in *Strickler* cautioned that the continued use of the term "probability" promoted the likelihood that courts would apply the forbidden "more likely than not" determination and thus violate *Kyles*, and it proposed that the term be deemed "inevitably imprecise," thus warranting changing the term to a "significant possibility." *Id.* at 298, 119 S.Ct. at 1956 (Souter and Kennedy, JJ., concurring and dissenting). The differing conclusions on materiality reached by *Strickler's* majority and dissent in analyzing the particular facts illustrate not only that the preceding discussion is not idle intellectualizing but also that a conclusion regarding materiality may well be entirely subjective when credibility judgments are at issue.

The subjectivity presented when evaluating the significance of credibility determinations is particularly troublesome in this case where Morris' credibility was the critical issue. Perhaps we could simply dispose of this case by simplistically concluding that had the Powell tape been disclosed, Morris would not have testified that she had used drugs two months earlier, but would have testified that she used them one month earlier; or by agreeing with the trial court that Morris had admitted that she had used drugs on a single occasion and a new trial is not required; or by deciding that the difference in time frames relating to Morris' drug use does not undermine our confidence in the verdict.

However, our review indicates that ... portions of the Morris tape [were] inaudible, and, therefore, [the defendant's] trial was dependent entirely upon Morris' testimony. Impeachment evidence that could be used to discredit such an important witness or cast doubt on her veracity is usually material. As previously discussed, the prosecution presented DCI agent testimony that bolstered Morris' credibility.... The Powell tape could have been used to discredit that testimony also. "The question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453, 115 S.Ct. at 1575.

*Davis*, 2002 WY 88, ¶¶ 17–22, 47 P.3d 981.

■ [¶ 16] The only evidence implicating Ms. Hensley in the controlled buy was Ms. Morris' testimony and an exceptionally bad tape recording. We must, therefore, conclude the undisclosed evidence, which could have been used to impeach Ms. Morris, was material. We reverse Ms. Hensley's conviction and remand this case for a new trial.

## B. Admission of Audio Tape

■ [¶ 17] We address the admissibility of the audio tape of the drug transaction because that issue will likely arise again in the event of a new trial.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

W.R.E. 403. "The balancing test required by Rule 403 is assigned to the sound discretion of the trial court." *Prindle v. State*, 945 P.2d 1180, 1183 (Wyo.1997), *abrogated on other grounds by Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998).

" 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capricious-

ly.' " *Oldman v. State,* 998 P.2d 957, 960 (Wyo.2000) (quoting [*Martin v. State,* 720 P.2d 894, 897 (Wyo.1986) ] ).

*Stout v. State,* 2001 WY 114, ¶ 7, 35 P.3d 1198, ¶ 7 (Wyo.2001).

[¶ 18] "[T]his Court [has] said that tape recordings of drug transactions are non-testimonial, and 'should be made available for a jury's review as any other exhibit.' *Warner v. State,* 897 P.2d 472, 475 (Wyo.1995)." *Contreras v. State,* 7 P.3d 917, 919 (Wyo. 2000). The court has stated further

> "a trial court's ruling permitting a jury to review the tapes should not be disturbed on appeal absent a clear abuse of discretion.... In addition, the exercise of that discretion should be upheld so long as the audio recording is otherwise admissible, and where the state introduces something more than a minimal amount of other evidence of culpability."

*Id.* (quoting *Warner,* 897 P.2d at 475).

[¶ 19] Ms. Hensley objected to the tape of the controlled buy, arguing it violated the hearsay rule and her constitutional right to confront witnesses because the neighbors' and Mr. Wilkie's voices could be heard on the tape and they did not testify at trial. The trial court overruled the objection, concluding the tape was not offered to prove the matters asserted by the unavailable witnesses and was the best evidence of what was said that day by Ms. Hensley and Ms. Morris.

█ [¶ 20] We conclude admission of the tape was within the trial court's broad discretion. Ms. Morris' eyewitness testimony and the DCI witnesses' testimony laid a proper foundation for the tape, assuring its trustworthiness.

The informant explained how she had been equipped with the portable recording de-

vice by the DCI agents, and she described the transaction ... in detail. The DCI agent testified that he assisted in equipping the informant with the tape recorder; monitored the informant throughout the transaction; and retrieved the micro cassette from the informant after the transaction was completed. "Admission is especially appropriate where a witness who heard the statements also testifies and the recording gives independent support to his testimony." *U.S. v. Davis,* 780 F.2d 838, 846 (10th Cir.1985), followed by, *U.S. v. Hanif,* 1 F.3d 998, 1002 (10th Cir.1993). The testimony from the informant and the DCI agent who monitored the transaction laid more than sufficient foundation to insure the trustworthiness and accuracy of the tape recordings. They were properly admitted into evidence....

*Crisp v. State,* 944 P.2d 1165, 1168 (Wyo. 1997). The tape was difficult to understand and, consequently, may not have been of significant benefit to the state's case. Discerning what was said by Mr. Wilkie and the neighbors is difficult, but none of what was said by them appears to implicate Ms. Hensley in any criminal activity. The tape was relevant to the proceedings, and the trial court had the discretion to allow its admission. The tape was properly admitted and played for the jury. *See Contreras,* 7 P.3d at 919–20.

[¶ 21] Affirmed in part, reversed in part, and remanded.