**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael J. BARBIERI,
Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Wayne ELLIOTT, Defendant-Appellant.**

Nos. 78–1447, 78–1448.

United States Court of Appeals,
Tenth Circuit.

Feb. 1, 1980.

David M. Johnson, of Hayes & Heisler, Clayton, Mo., for defendant-appellant Michael J. Barbieri.

Robert J. Turner, of Turner, Turner & Green, Oklahoma City, Okl., for defendant-appellant Wayne Elliott.

Teresa M. Black, Asst. U. S. Atty., Oklahoma City, Okl. (with Larry D. Patton, U. S. Atty. and Susie Pritchett, Asst. U. S. Atty., Oklahoma City, Okl., on the brief), for plaintiff-appellee.

Before SETH, Chief Judge, BREITENSTEIN and McKAY, Circuit Judges.

McKAY, Circuit Judge.

Defendant Barbieri is the imaginative author of an elaborate scheme aimed at achieving a national monopoly in the prostitution industry. Although Barbieri's plan was described as "infalable [*sic*] and he thought it over and there was nothing illegal about forming a Hookers' Union [that was] going to take over the whole country," Record, vol. 7, at 242, Barbieri and a companion, Elliott, met with some difficulties in implementing it. Their criminal convictions are the subjects of this appeal.

Barbieri's initial attempts at implementation were made in St. Louis, Missouri, with an experienced prostitute named Hinchcliff. Competition being what it is in the business, Barbieri and Hinchcliff found it convenient to terminate their operation before certain threats from unhappy competitors were successfully carried out. But Barbieri was undaunted. He determined that if the police could be deceived into thinking his establishment was a front for law enforcement, analogous to police-sponsored "sting" operations, he could continue toward his goal protected from prosecution as well as from competition. When unsuccessful with the police, he advised Hinchcliff to transfer to Las Vegas and indicated that they "would pick up business elsewhere." Record, vol. 7, at 148. Oklahoma City was among the list of possibilities.

On November 16, 1977, Barbieri was sent by his employer to Oklahoma City for a few weeks to supervise the refurbishing of an airplane. While there, Barbieri encountered Elliott, the co-defendant, and, in the usual course of her business, a prostitute named Davis. On November 25, Barbieri, his girl friend and Elliott drove to St. Louis. They returned to Oklahoma City November 27.

The day after his return, Barbieri again visited Davis and, among other things, proposed that she join with him in setting up an escort service in Oklahoma City. Sometime thereafter Barbieri met with Davis to introduce her to Elliott, "the person who was going to be in charge of the Oklahoma City operation" and who would be the contact with Barbieri and "the home office in St. Louis." Record, vol. 7, at 323–24. In the series of meetings that followed, Barbieri, Elliott and Davis discussed the grand prostitution scheme, dignified by Barbieri's and Elliott's occasional references to their links to "the old man" of organized crime.

During one of the meetings, Barbieri telephoned Hinchcliff in Las Vegas, telling her while Elliott and Davis listened: "Things look real good, it looks like we can take over the city and run the city and I want you to come to Oklahoma City, bring Mitzi, and we are going to start our organization." Record, vol. 7, at 329. He explained to Hinchcliff that he had a girl who knew the business in Oklahoma City and that he and a friend were there preparing to set up an apartment "just like we had in St. Louis." *Id.* at 190. Hinchcliff then traveled from Las Vegas to Oklahoma City.

The plan for Oklahoma City went forward, but not without problems. Arrangements were made for an apartment, a telephone was installed, and advertisements for the escort service appeared in the paper. In the meantime, however, Davis had become a police informer. Although suspicious, Barbieri and Elliott did not exclude her before she obtained extensive incriminating tape recordings.

Barbieri was indicted in Count I essentially for traveling from St. Louis, Missouri, to the Western District of Oklahoma on November 27, 1977, with the intent to promote, manage, establish, or carry on prosti-

tution operations in violation of the Travel Act, 18 U.S.C. § 1952.[1] In the second count, Barbieri and Elliott were indicted for conspiracy to commit a violation of the Travel Act. 18 U.S.C. § 371. Among the overt acts alleged by the government were Barbieri's travel on November 27, an interstate phone call to Hinchcliff and Hinchcliff's travel from Las Vegas to Oklahoma City. In the face of the prostitutes' direct testimony and the tape recordings, neither Barbieri nor Elliott found it profitable to deny the bulk of the government's case. Instead, each testified that the endeavor was an elaborate put-on, a big game, a fantasy, and that he had no intention of carrying it out. While the exaggerated nature of some of the ideas involved gave credence to the defense, the jury did not believe it. Barbieri was convicted on both counts, and Elliott on Count II.

### BARBIERI'S APPEAL

#### Evidence of Intent

A successful prosecution under the Travel Act, 18 U.S.C. § 1952, requires proof that the defendant (1) traveled or used facilities in interstate commerce; (2) with intent to promote, manage, establish, carry on or facilitate the promotion,. management, establishment, or carrying on of a prohibited activity—*e. g.*, illegal prostitution; and (3) thereafter attempted to or did in fact engage in one of the proscribed activities.

By linking the interstate element to the proscribed activity with an intent requirement, Congress made it clear that there must be a coincidence between the purpose of interstate activity and the prohibited objective. The question is: Why was the travel or the use of an interstate facility undertaken? The interstate means must be used in furtherance or in facilita-

---

1. The Travel Act provides in pertinent part:

    (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

    . . . . .

    (3) . . . promote, manage, establish, carry on, or facilitate the promotion, manage-

ment, establishment, or carrying on, of any unlawful activity [which is defined under (b) to include "prostitution offenses in violation of the laws of the State in which they are committed"],

and thereafter performs or attempts to perform any of the acts specified . . . shall be fined . . . or imprisoned . . . .

tion of the illegal activities. *See Erlenbaugh v. United States*, 409 U.S. 239, 246, 93 S.Ct. 477, 481, 34 L.Ed.2d 446 (1972); *United States v. Graham*, 581 F.2d 789, 790 (9th Cir. 1978). *Cf. United States v. Marino*, 421 F.2d 640, 641 (2d Cir. 1970). The use of the interstate means need not be essential to the illegal scheme as long as it makes the illegal objective "less difficult" to accomplish. *United States v. Miller*, 379 F.2d 483, 486 (7th Cir.), *cert. denied*, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967). Of course, the facilitation of the proscribed activity need not be the sole purpose for the use of interstate means. *United States v. Pauldino*, 443 F.2d 1108, 1112 (10th Cir.), *cert. denied*, 404 U.S. 882, 92 S.Ct. 212, 30 L.Ed.2d 163 (1971). "The fact that travel is motivated by two or more purposes, some of which lie outside the ambit of the Travel Act, will not preclude conviction under the Act if the requisite § 1952(a) intent is also present." *United States v. Gooding*, 473 F.2d 425, 428 (5th Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973). In contrast, there will be circumstances where the crossing of state lines will be wholly unrelated to any criminal objective. For instance, one engaged in an illegal prostitution operation may take a vacation in another state and then return to his home and activities without violating the Act. *See United States v. Judkins*, 428 F.2d 333, 335 (6th Cir. 1970); *United States v. Hawthorne*, 356 F.2d 740 (4th Cir.), *cert. denied*, 384 U.S. 908, 86 S.Ct. 1344, 16 L.Ed.2d 360 (1966).[2] If the use of the interstate facility is incidental to the scheme, no federal crime is committed. *See United States v. Villano*, 529 F.2d 1046, 1053 (10th Cir. 1976); *United States v. Altobella*, 442 F.2d 310, 315 (7th Cir. 1971).

■ The difficult task in many Travel Act prosecutions is not in producing evidence of the proscribed activities or the use of interstate means, but in showing the connecting intent. In most cases intent must be proved by circumstantial evidence. *See United States v. Pauldino*, 443 F.2d 1108, 1114 (10th Cir.), *cert. denied*, 404 U.S. 882, 92 S.Ct. 204, 30 L.Ed.2d 163 (1971). Determining when there is sufficient proof to permit the jury to infer the requisite intent is rarely simple. Such a determination cannot be made by resort to a fixed rule but must be made on a case-by-case basis, keeping in mind the government's burden of proof. Applying these principles here, we believe that there was sufficient evidence to support the jury's finding that Barbieri's interstate trip from Oklahoma City to St. Louis and back was in furtherance of his criminal objectives. The trial court therefore did not err in submitting the case to the jury.

The only direct testimony bearing on intent was presented by Barbieri and Elliott. That testimony indicates an innocent purpose for the trip. The prosecution evidence offered to show intent was entirely circumstantial. However, viewed in a light most favorable to the government, this evidence clearly showed that Barbieri formed the intent before the trip to establish an interstate prostitution network, with a branch in Oklahoma City and the headquarters in St. Louis, and that Barbieri undertook overt acts in furtherance of that intent immediately upon his return to Oklahoma City. The evidence showed that Barbieri's companion on the trip, Elliott, was his co-conspirator in establishing the Oklahoma activities. It showed that Barbieri and Elliott applied for a $200,000 loan while in St. Louis. It showed repeated references by Barbieri and Elliott in Oklahoma City meetings to organized crime connections in St. Louis. Finally, it showed that the day after the trip Barbieri told Davis, whom he was

---

2. In *Hawthorne* the court held: "It is not the intent of the [Travel Act] to make it a crime per se for one who [conducts a prohibited activity] to travel interstate." 356 F.2d at 742. In *Hawthorne*, the defendant had traveled from his home in Indiana to West Virginia where he made arrangements for opening a supper club with gambling facilities. He returned to Indiana and moved his family to West Virginia. Only the latter trip was charged in the indictment. Because the immediate purpose of this trip was to move the defendant's family, the court found the trip insufficiently related to the prohibited activity to bring the trip within the interdiction of the Travel Act.

enlisting in the illegal Oklahoma enterprise, that "he was with a group from St. Louis that has been currently for the past six weeks surveying the Oklahoma City market and he was going to set up an escort prostitution services [*sic*] in Oklahoma City." Record, vol. 7, at 320. Taken together this evidence was more than sufficient to make the substantial purpose of the trip a jury question.

### The Admission of the St. Louis Evidence

■ Barbieri complains that the trial court erred in admitting inflammatory evidence regarding his earlier attempt to organize a prostitution operation in St. Louis, Missouri. Under Fed.R.Evid. 404(b), evidence of crimes not charged in the indictment may be admitted to prove, among other things, intent and plan. *See United States v. Ahern*, 612 F.2d 507, 509 (10th Cir. 1980). The admissibility of such evidence is within the sound discretion of the trial judge. *See United States v. Nolan,* 551 F.2d 266, 271 (10th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). We find no abuse of discretion here.

Matters of intent and plan were crucial in this case. The evidence was relevant for a purpose other than showing bad character; it was clear and convincing; and its probative value substantially outweighed the danger of prejudice. *See United States v. Scholle,* 553 F.2d 1109, 1121 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). The St. Louis evidence showed the dimensions and continuing nature of Barbieri's scheme. It put the activities in Oklahoma City in context. *See United States v. Pauldino,* 443 F.2d 1108, 1113 (10th Cir.), *cert. denied,* 404 U.S. 882, 92 S.Ct. 204, 30 L.Ed.2d 163 (1971). Finally, it provided a basis for understanding the testimony—*e. g.,* Barbieri's promise to Hinchcliff to set up an apartment "just like we had in St. Louis." Record, vol. 7, at 190. *See United States v. Wright,* 606 F.2d 939, 940 (10th Cir. 1979).

### Bill of Particulars

■ Barbieri also assigns as error the district court's failure to grant his motion for a bill of particulars. Among the particulars requested by Barbieri were:

1. The specific event, facts, conduct, or circumstances upon which the allegations in the indictment are based.

\*   \*   \*   \*   \*   \*

3. The names, addresses, and criminal records, if any, of informants used in this case.

\*   \*   \*   \*   \*   \*

5. State the exact nature of the facts or acts . . . which establish that defendant allegedly conspired to and did travel in interstate commerce . . . ., *and the names and addresses of the witnesses to said facts or acts.*

Record, vol. 1, at 22.

A district court's denial of a motion for a bill of particulars will not be disturbed on appeal unless an abuse of discretion is shown. *See Wyatt v. United States,* 388 F.2d 395, 397 (10th Cir. 1968). *Cf. Will v. United States,* 389 U.S. 90, 99, 88 S.Ct. 269, 275, 19 L.Ed.2d 305 (1967). We find no abuse of discretion here. The indictment was sufficiently complete and precise to enable Barbieri to prepare a defense and avoid prejudicial surprise at trial and to bar the risk of double jeopardy. *See United States v. Addonizio,* 451 F.2d 49, 58–60 (3d Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). *Cf. Will v. United States,* 389 U.S. 90, 101, 88 S.Ct. 269, 276, 19 L.Ed.2d 305 (1967). *See also King v. United States,* 402 F.2d 289, 292 (10th Cir. 1968). The indictment furnished Barbieri with the identity of the conspirators; it detailed overt acts sufficient to sustain his conviction; and it specified the interstate facilities used.

In the circumstances of this case, Barbieri's motion for a bill of particulars appears to be an improper request for evidentiary detail. It is not the function of a bill of particulars "to disclose in detail the evidence upon which the Government will rely at the trial." *Cefalu v. United States,* 234 F.2d 522, 524 (10th Cir. 1956). Specifically, a "bill of particulars cannot be used to obtain a list of the government's witnesses

or evidentiary detail." *United States v. Johnson*, 504 F.2d 622, 628 (7th Cir. 1974) (citations omitted). *See United States v. Murray*, 527 F.2d 401, 411 (5th Cir. 1976); *United States v. Pennick*, 500 F.2d 184, 186 (10th Cir.), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974).

### Conspiracy

■ Barbieri also challenges the sufficiency of the evidence to prove the existence of an agreement, an essential element of a conspiracy. We find the evidence more than ample to support the verdict.

## ELLIOTT'S APPEAL

### Conspiracy

■ Elliott argues that there is no evidence of his agreement to use interstate means and he therefore could not have conspired to violate the Travel Act. Ignorance that the means intended to be used is indeed interstate, as opposed to intrastate, is no defense. There is no requirement in the Travel Act that the defendant or co-conspirator have knowledge of the interstate character of the intended means. *See United States v. Villano*, 529 F.2d 1046, 1054 (10th Cir.), *cert. denied*, 426 U.S. 953, 96 S.Ct. 3180, 49 L.Ed.2d 1193 (1976). In addition, an involved party who should have reasonably foreseen the use of interstate facilities in furtherance of a shared criminal scheme can be held under the Travel Act. *See id. Cf. United States v. Marino*, 421 F.2d 640, 641 (2d Cir. 1970). Because Elliott was aware when he joined the conspiracy of the national scale in which Barbieri cast his plans, Elliott must have foreseen interstate travel and communication. Elliott was present when Barbieri discussed bringing Hinchcliff from Las Vegas and when Barbieri telephoned her with the proposal that she join the Oklahoma City group. Record, vol. 7, at 328–29, 352. Furthermore, Elliott told Davis he "would be in charge of Oklahoma City," and "he would be the direct contact" with St. Louis. *Id.* at 328. We find this evidence sufficient.

### The St. Louis Evidence

Elliott first protests the introduction at trial for any purpose of evidence of Barbieri's St. Louis activities. He claims that the details of the rewards and hazards of the prostitution business, including references to drugs and violence, unnecessarily invoked the prejudices of the jury. Evidence concerning prior involvements of Barbieri and Hinchcliff in prostitution operations, as we have said, was admissible to provide context and to prove intent and plan. Some of the comments woven into this testimony may have made the trial more colorful than necessary, but we do not find grounds for a mistrial, particularly since Elliott made no objections at trial to the specific testimony he cites as generally inflammatory.

■ Finally, Elliott insists that, even if the evidence was admissible as to Barbieri, it was error for the district court to reject his proffered instruction on the applicability of the St. Louis evidence to him. We have reviewed the instructions and cautionary statements made before the jury and conclude that, taken as a whole, they are adequate.

AFFIRMED.