**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 21 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CHRISTOPHER JAMES TYLER and
DARRELL WAYNE COLLINS,

      Defendant - Appellants.

Nos. 00-6284, 00-6341
(D.C. No. CR-99-216-M)
(W.D. Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **SEYMOUR**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**, Circuit Judge.

Defendants-Appellants Christopher Tyler and Darrell Collins raise a multitude of issues arising from their convictions and sentences for their part in a cocaine distribution ring. The only error in the proceedings below stems from the district court's finding that Collins qualifies as a career offender, as the record does not adequately establish the violent nature of the crime relied on as a

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

predicate offense by the district court. All of the remaining issues raised by Tyler and Collins are without merit.

I.      *Bill of Particulars*

Tyler challenges the district court's denial of his motion for a bill of particulars and argues that his trial was rendered fundamentally unfair when the Government changed its theory of the case during trial. He claims that the Government's key witness, Darrell James, testified that the drug transactions at issue occurred at locations different from those alleged in discovery. Because of this change, Tyler contends that he was unable to defend himself. "We review the denial of a motion for a bill of particulars for abuse of discretion," United States v. Ivy, 83 F.3d 1266, 1281 (10th Cir. 1996), and will not disturb it "unless the defendant shows that he was actually surprised at trial and thereby incurred prejudice to his substantial rights." United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir. 1995) (internal quotation marks omitted).

In response to Tyler's motion for a bill of particulars, the Government referred to the materials already provided to Tyler through discovery, including the FBI 302 evidence forms. Although Tyler failed to include those forms in the record, he contends that one of the forms indicated that James had told the FBI that he gave Tyler two ounces of crack cocaine on October 7, 1999, when "the

two met riding horses." Also, an FBI agent apparently testified before the grand jury that James had told the agent that, after Tyler had used the telephone to order crack cocaine at 5:53 p.m. on October 7, James delivered the drugs to Tyler later that same evening. Based on this evidence, Tyler had constructed his defense to show that he had not been riding horses on October 7.

At trial, however, James testified that the exchange of crack cocaine on October 7 took place at "the center, Minnis Lakeview; it is a basketball gymnasium in Spencer." Tyler objected, and the prosecutor admitted that "I, for the first time today have heard this. I am stuck with the witness's answer, as well." Tyler requested: 1) that James be prohibited from testifying about the new location and whatever events allegedly happened there; 2) that the Government respond to the bill of particulars on this point, and for additional time; or 3) that the court declare a mistrial. The district court instructed the jury to "disregard any testimony of this witness pertaining to anything that happened at a Minnis Lakeview location." Because the district court granted Tyler's requested relief, it is unclear what ground he has for urging that the court abused its discretion.

According to Tyler, however, the unfair surprises continued, as James testified that the transaction occurred "later on [October 7] or that next morning." And because the Government phrased its questions to James regarding location in the most general terms – given that James was prohibited from testifying about

the Minnis Lakeview location – Tyler argues that he could not defend against the vague assertion that the transaction occurred somewhere within the Western District of Oklahoma.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." Ivy, 83 F.3d at 1281 (internal quotation marks omitted). If "the indictment sets forth the elements of the offense charged and sufficiently apprised the defendant of the charges to enable him to prepare for trial," a bill of particulars is not necessary. Id. (internal quotation marks omitted). Significantly, a defendant "is not entitled to notice of all of the evidence the government intends to produce, but only the theory of the government's case," id. (internal quotation marks omitted), for a bill of particulars "is not a discovery device." United States v. Dunn, 841 F.2d 1026, 1029 (10th Cir. 1988).

Tyler does not argue that the vagueness of the indictment mandated a bill of particulars. In any event, the indictment's substance precludes such an argument, as it charges a group of defendants with drug crimes, and includes several allegations targeting Tyler specifically. The indictment:

- alleges that James provided cocaine to Tyler, and that Tyler re-distributed the cocaine to customers;

- lists some of the customers' names;

- lists several of the storage and distribution locations;

- alleges that Tyler used a telephone in Choctaw, Oklahoma, to facilitate drug distribution on October 7, 1999 at about 5:53 p.m., on October 26, 1999 at about 9:16 p.m., on November 2, 1999 at about 1:47 p.m., and on November 16, 1999 at about 7:07 p.m.;

- alleges that Tyler possessed with intent to distribute two ounces of crack on October 7, 1999, three ounces on October 27, 1999, and one ounce on November 2, 1999, all in Choctaw, Oklahoma.

Tyler did not include his motion for a bill of particulars in the record, so we have no way of knowing what additional information he requested. Nevertheless, case law establishes that, in light of the information set forth in the indictment, the district court did not abuse its discretion in denying the motion. In United States v. Barbieri, 614 F.2d 715 (10th Cir. 1980), for example, the defendant moved for a bill of particulars setting forth "[t]he specific event, facts, conduct, or circumstances upon which the allegations in the indictment are based." Id. at 719. This court upheld the district court's denial of the motion, reasoning that, because "[t]he indictment was sufficiently complete and precise to enable Barbieri to prepare a defense and avoid prejudicial surprise at trial," the motion "appears to be an improper request for evidentiary detail." Id.

Similarly, in Wyatt v. United States, 388 F.2d 395 (10th Cir. 1968), a defendant charged with liquor law violations moved for a bill of particulars setting forth "information as to whom the non-tax-paid whiskey was sold to, who sold it to this person, and also where the whiskey was manufactured." Id. at 397.

The district court did not abuse its discretion in denying the motion, this court held, because "the charges in the indictment set out the specific date, the specific amount of non-tax-paid whiskey involved and that the event occurred on or about a public street in Guthrie, Logan County." Id. The failure to identify the purchaser of the whiskey did not render "the indictment so vague" as to require a bill of particulars. Id. Likewise, the indictment in this case identified the quantity of drugs, the dates of the alleged offenses, and the general location of the offenses. A bill of particulars was not required.

Tyler, however, is not simply arguing that the indictment's deficiency warranted a bill of particulars. Rather, he seems to claim that the surprise testimony offered by James somehow renders erroneous the district court's earlier denial of the motion for a bill of particulars. However, the alleged change in testimony did not go to a key allegation or to a central theory of the Government's case. James's trial testimony that the October 7 drug transaction occurred at a basketball court allegedly contradicted James's earlier statement to the FBI that the transaction occurred riding horses. It is true that Tyler did not have an opportunity to refute directly James's basketball court reference, but the district court remedied that potential prejudice by instructing the jury not to consider the reference. As for the fact that James's abandonment of the "riding horses"

- 6 -

allegation rendered Tyler's planned defense to that allegation irrelevant, Tyler could have attempted to take strategic advantage of James's changing testimony.

The same analysis applies to the extent that James contradicted earlier statements as to timing by testifying that the October 7 transaction occurred "later on that day or that next morning." The district court did not abuse its discretion in denying the motion for a bill of particulars simply because the trial testimony of a witness for the Government contradicted his earlier statements.

II. *The Admission of Tape Recordings*

Tyler vaguely objects to the district court's ruling that certain tape recordings offered by Tyler were inadmissible. The recordings were intended to impeach James, but they apparently were no longer impeaching given the change in James's testimony. If the tapes were no longer impeaching – a fact Tyler does not seem to dispute – then they were not admissible for impeachment purposes.

III. *Prosecutorial Misconduct*

Tyler argues that his right to a fair trial was violated by four types of prosecutorial misconduct: improper leading questions, improperly shifting the burden of proof, vouching for witnesses, and cumulative misconduct. We review the district court's denial of Tyler's motion for a new trial based on prosecutorial

misconduct for abuse of discretion.  <u>United States v. Maynard</u>, 236 F.3d 601, 605 (10th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 1642 (2001).

### A.      *Improper Leading Questions*

According to Tyler, the prosecutor's leading questions caused undue prejudice to Tyler because the prosecutor "ended up, in essence, testifying," and the questions "enabled the witnesses to mold their testimony in exact accordance with the government's theory of the case."

Appellate courts have shown "an almost total unwillingness to reverse for infractions" of the rule against leading questions.  <u>United States v. DeFiore</u>, 720 F.2d 757, 764 (2d Cir. 1983) (internal quotation marks and brackets omitted). Federal Rule of Evidence 611(c) prohibits the use of leading questions on direct examination of a witness "except as may be necessary to develop his testimony." This Rule vests broad discretion in trial courts.  Accordingly, we reverse on the basis of improper leading questions only if the judge's action amounted to, or contributed to, the denial of a fair trial.

Against this background, Tyler has failed to show that his trial was rendered unfair by the Government's leading questions.  Tyler contends that the direct examination of James was full of leading questions, and cites two questions as especially prejudicial to Tyler's defense:

Q: Did [Tyler] talk to you about other people in fact coming in from out of town?

. . . .

Q: That crack cocaine that you were going to supply him would be for the people that [Tyler] had coming in.

The court sustained Tyler's objections to both questions, but Tyler claims that James was already tipped off to link his supply to Tyler with Tyler's subsequent re-distribution to out-of-town customers.

The context of these questions shows that they caused Tyler little prejudice. James knew that customers came from out of town, and it would not have required a leading question for him to divulge that information. After the court sustained Tyler's leading objection, the Government asked where the customers came from, and James identified another city where he thought at least one customer came from. The previous leading question certainly did not provide James with that specific information. The fact that a previous question was improperly leading does not somehow taint all of the information independently obtained through subsequent non-leading questions.

As for the question leading James to link his supply to Tyler with "the people that [Tyler] had coming in," there was already properly elicited testimony suggesting as much. The following exchanges drew no objections from Tyler, and occurred before the question at issue:

- 9 -

Q: Did [Tyler] have some concerns that he voiced towards the end of the conversation with regard to some of his people?

A: Yes, he was mentioning his buddies coming, that he had people coming down here that he would like to be ready for.

. . . .

Q: Based upon what [Tyler] told you about these people coming, did you, at your end of the conversation, believe he needed crack cocaine?

A: Yes, ma'am.

The question at issue did not add much to this testimony.

The frequency of other leading questions in the direct examination of James, while perhaps indicative of less-than-exemplary examination skills, do not appear too far out of the ordinary. The district court sustained Tyler's objections – Tyler claims that he made 18 such objections – and in several instances, admonished the Government. Such actions cannot be considered an abuse of discretion on the district court's part.

Finally, Tyler claims that he was prejudiced by the Government's comment in the following exchange before the jury:

Q: In your debriefings, you were the one that has informed the Government of these other transactions; is that correct?

[Objection, Leading]

A: Yes.

The Court: Ms. Maye, this witness does not need to be led.

- 10 -

Q: Mr. Owens, have you told the Government about your other drug transactions?

The Court: Why don't you ask, "What have you told the Government?"

Ms. Maye: We would be here all day.

The Court: Well, that's all right; don't ask leading questions.

Tyler then requested a bench conference, and expressed his concern that the comment, "We would be here all day," might suggest to the jury that the facts contained in the leading questions are true and that the Government was simply trying to save time. Tyler asked "that the jury be admonished that leading questions are improper." The court admonished the jury as requested. There is no basis for concluding that Tyler's right to a fair trial was violated.

### B. *Shifting the Burden of Proof*

Tyler argues that the Government improperly shifted the burden of proof with the following comment in closing arguments:

> The only interpretation of that deuce – and it is uncontroverted – is that it was two ounces of crack cocaine that then Darrell James delivered to Chris Tyler. That came from Christopher Tyler's mouth, not from a snitch.

Tyler's objection to the comment was sustained. He also contends that two other comments shifted the burden of proof. First, the Government argued that "[t]here is no evidence that [Tyler] used crack cocaine so anything and everything that he

- 11 -

bought from Darrell James was resold." Second, the Government argued that "there is no evidence that [James] did not deliver that three ounces and put it in the feed bucket for Chris Tyler." Tyler did not object to these comments, but he contends that they amount to plain error.

Because the Government, according to Tyler, changed its theory of the case during trial, the only evidence available to refute the changed theory was Tyler's own testimony. By commenting on the "uncontroverted" evidence and the lack of evidence, Tyler insists that the Government was improperly commenting on Tyler's failure to testify.

The test to determine whether a prosecutor's remarks constitute an impermissible comment on the accused's failure to testify is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Hooks, 780 F.2d 1526, 1533 (10th Cir. 1986) (internal quotation marks omitted). The reviewing court "must examine the prosecutor's remarks in the context of the entire record" to determine if they constitute prejudicial error. Id.

None of the three comments challenged by Tyler would lead the jury to "naturally and necessarily" conclude that the Government was commenting on Tyler's failure to testify. The first comment – asserting that the interpretation of

"deuce" as two ounces of crack was "uncontroverted" – is based on a tape recording of a phone call between Tyler and James. Tyler was not the only person who could have cast doubt on the Government's interpretation – James could have as well, whether on direct or through cross-examination. In any event, Tyler's objection was sustained, and the comment was rephrased. Second, the assertion that there was "no evidence" that Tyler used cocaine personally could have come from anyone who knew or observed Tyler, including James, and did not require an admission from Tyler himself. Finally, evidence that the cocaine was not left in the feed bucket could have been supplied by James on cross-examination, by other participants in the drug scheme, or by other eyewitnesses. Whether or not Tyler was the most logical person to refute all of the Government's assertions does not mean that the Government was commenting on his failure to testify by making the assertions in the first place.

In any event, the district court instructed the jury that "[t]he fact that a defendant did not testify must not be discussed or considered by the jury in any way when deliberating and in arriving at your verdict," and that "[n]o inference of any kind may be drawn from the fact a defendant decided to exercise his privilege under the Constitution and did not testify." This cured any prejudice resulting from the prosecutor's comments.

C.    *Improper Vouching*

Tyler contends that the prosecutor committed plain error in his closing argument by telling the jury that the Government's witnesses:  (1) had given "truthful testimony"; (2) did not "lie"; and (3) were "credible and believable."  In addition, in her second closing argument, the prosecutor argued that the witnesses "have provided honest and truthful testimony of their drug dealing and they have personal knowledge because they dealt with Darrell Collins and Christopher Tyler."  Tyler objected to this final comment, but was overruled.  According to Tyler, these comments improperly vouch for the credibility of the Government's witnesses. "[V]ouching by an attorney as to the veracity of a witness is improper conduct and an error which this court will carefully review." United States v. Swafford, 766 F.2d 426, 428 (10th Cir. 1985).

The Government was attempting to rebut Defendants' arguments that the Government's witnesses were lying in order to benefit themselves.  For example, Collins's counsel stated in his opening that "[t]he Government will rely primarily on testimony of charged co-defendants who have cut a deal.  Listen to their testimony carefully and evaluate what is in it for them."  Tyler's counsel cross-examined James by focusing on the benefit he would receive from the Government by gaining convictions through his testimony, and in his closing, he focused on the self-serving nature of the witnesses's testimony.  One factor in

- 14 -

determining whether improper vouching has occurred "is the extent to which the witness's credibility was attacked." See, e.g., United States v. Rudberg, 122 F.3d 1199, 1204 (9th Cir. 1997) (internal quotation marks omitted). Here, attacking the credibility of the Government's witnesses was a focus of Defendants' case.

Further, any vouching statements must be judged against the context of the entire proceeding. In her closing argument, the prosecutor told the jury that "[y]ou saw [the witnesses] on stand. You can determine their honesty." And the court instructed the jury extensively on evaluating witnesses' credibility, and told them that "[y]ou, as jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case and only you determine the importance or the weight that their testimony deserves." The jury was also cautioned that the statements of the lawyers are not evidence. Even assuming that the prosecutor's statements were improper, these measures were sufficient to cure any error. United States v. Roberts, 185 F.3d 1125, 1144 (10th Cir. 1999) (noting that "the prosecutor explicitly disclaimed any ability to vouch for witness credibility, and the judge's instructions to the jury cured any error").

D. *Cumulative Misconduct*

We find meritless Tyler's assertion that the prosecutor's cumulative misconduct entitles him to a new trial.

*IV.* *Admission of Title III Evidence*

Both Tyler and Collins argue that the district court erred by denying their motion to suppress certain Title III evidence – specifically, tape recorded telephone conversations. Defendants contend that the Government's failure to provide them with copies of the court order and accompanying application authorizing the recording more than ten days prior to trial requires suppression of the recordings. On a review of a motion to suppress, the district court's factual findings will be accepted unless clearly erroneous, questions of law are reviewed de novo, and the evidence must be viewed in the light most favorable to the prevailing party. United States v. Edwards, 69 F.3d 419, 428 (10th Cir. 1995).

The statute at issue provides that:

> The contents of any wire, oral, or electronic communication intercepted pursuant to this chapter or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved. This ten-day period may be waived by the judge if he finds that it was not possible to furnish the party with the above information ten days before the trial, hearing, or proceeding and that the party will not be prejudiced by the delay in receiving such information.

18 U.S.C. § 2518(9).

The purpose of the 10-day requirement "is to give the defendant an opportunity to make a pretrial motion to suppress wiretap evidence." United

States v. Caro, 965 F.2d 1548, 1554 (10th Cir. 1992).  In order to justify the reversal of a conviction, the violation of § 2518(9) must have caused the defendant prejudice.  United States v. Winter, 663 F.2d 1120, 1154 (1st Cir. 1981).

In this case, the district court agreed with Defendants' contention that the Government had failed to comply with § 2518(9)'s 10-day requirement.  On the first day of trial, during the first witness's direct examination, Defendants objected to the introduction of the tape recordings.  The court ruled that the statute had been violated, and ordered a continuance of the trial to allow Defendants to file a motion to suppress.  The motion was ultimately denied, and trial was resumed six weeks later.

Defendants contend that they were prejudiced simply by the fact that, at the time their trial began, they had not been provided with the required materials more than ten days previously.  Defendants knew that wiretap evidence was going to be used against them – they simply had not been given copies of the wiretap application or the court order authorizing the wiretap.  The district court stopped the trial before any of the wiretap evidence was introduced and gave Defendants more than ten days to file their motions to suppress based on the materials disclosed by the Government.  Trial did not resume until weeks later, when the motions had been fully briefed and ruled upon.  Defendants' position would not

only convert § 2518(9) into a strict liability statute, but it would mean that once the provision is violated, the underlying evidence could <u>never</u> be used. Defendants offer no legal support for such an interpretation, and we reject it.

In a cursory statement, Tyler also contends that the Title III intercepts from Darrell James's mobile phone should have been suppressed because the Government failed to prove necessity. In its order denying the motion to suppress, the district court devoted five pages to detailed findings as to why the wiretaps were necessary. The district court's analysis is more than sufficient, especially given Tyler's failure even to hint at how the court might have erred.

## V.    *Sufficiency of the Evidence*

Tyler argues that the district court erred in denying his motion for acquittal because the evidence was insufficient to support Tyler's convictions. After reviewing the record in this case, we find this argument meritless.

## VI.    *Right to Confront Witnesses*

Tyler argues that his Sixth Amendment right to confront witnesses was violated when the district court restricted his ability to cross-examine Darrell James by precluding Tyler's use of two tape recordings. Because Tyler failed to

raise adequately this issue below, we review for plain error, and find that both tapes were properly excluded.

VII.    *Government's Use of Tyler's "Mug Shot" and Admission of Cocaine*

In its opening statement, the Government used a demonstrative chart labeled "Organization Drug Flow Chart," which included photos of the alleged co-conspirators, including Tyler. Tyler objected to the chart's use of the word "drug," and to the photographs, which he argued were "mug shots," and thus unduly prejudicial. The district court ordered the Government to cover the words "Organization Drug Flow Chart," but allowed use of the chart because it could not determine whether the photos were mug shots, rather than simply "close-up face shot[s]." Because Tyler did not include a copy of the chart in the record, there is no reason to question the district court's conclusion.

Tyler also objects to the admission of seized crack cocaine, contending that it was "never connected to Tyler." There is no dispute, however, that it was seized from participants in the conspiracy during the course of the conspiracy. Given that the Government established that Tyler was part of the conspiracy, he has no ground to object to the evidence's admission.

## VIII.  *Evidence of Previous Drug Activities*

Collins contends that the district court abused its discretion under Federal Rule of Civil Procedure 404(b) by allowing co-conspirator Herman Owens to testify about the nature of his relationship with Collins in the years before the period covered by the indictment.  Specifically, the Government questioned Owens about his past involvement with Collins in the distribution of drugs.  After Collins objected, the Government argued that the line of questioning "provides a background and the basis for this witness to have the knowledge of the facts that he is going to be testifying about," and that, through discovery, Collins had notice that these prior acts would be introduced.  The court allowed the questioning, but warned the Government not to "dwell on it."

On appeal, the Government first contends that Collins waived this issue by not objecting at trial in specific enough terms.  The basis of Collins's argument on appeal is Rule 404(b), which allows evidence of other crimes, wrongs or acts where offered to establish proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed. R. Evid. 404(b).  However, Collins objected to the line of questioning at trial on the grounds of relevance and that "[a]ny probative value is extremely outweighed by prejudice."  Because Collins did not invoke Rule 404(b) or otherwise refer to its substance, the district court's ruling is subject to plain error review.  See Smith v. Atlantic

Richfield Co., 814 F.2d 1481, 1486 (10th Cir. 1987) ("[A] specific overruled objection protects the record to the extent of the ground specified, but does not avail the party of other grounds that could have been raised but were not."). In any event, whether the district court's ruling is reviewed for abuse of discretion or plain error, Collins's argument fails.

Collins focuses on determining whether the testimony was admissible under Rule 404(b). That determination is governed by four factors: whether the evidence is offered for a proper purpose; whether the evidence is relevant; whether the probative value is substantially outweighed by the potential for unfair prejudice; and whether the district court offered a limiting instruction. Huddleston v. United States, 485 U.S. 681, 691-92 (1988).

First, it is not clear whether Rule 404(b) even applies to the line of questioning at issue, for evidence "relevant to establish how the conspiracy came about, how it was structured, and how each appellant became a member," is "not extrinsic to the conspiracy charged," even if it predates the time period set forth in the indictment. United States v. Lokey, 945 F.2d 825, 834 (5th Cir. 1991). See also United States v. Record, 873 F.2d 1363, 1372 n.5 (10th Cir. 1989) (recognizing that Rule 404(b) is inapplicable where uncharged act is "is inextricably intertwined with the charged crime such that a witness' testimony would have been confusing and incomplete without mention of the prior act"

(internal quotation marks omitted)).  The testimony at issue concerned how Owens and Collins established their relationship and began to distribute drugs together, which led to their involvement in the conspiracy charged in the indictment.

Even if Rule 404(b) applies, the Rule is satisfied because the evidence "was relevant for purposes other than to show criminal character; as permitted by Rule 404(b), it was relevant to show the formation of the conspiracy and its operating procedures," as well as "appellants' knowledge of the conspiracy and their intent to engage in the transactions listed in the time frame of the conspiracy."  <u>Lokey</u>, 945 F.2d at 835.  Collins has offered no basis for concluding that the district court abused its discretion in finding that the testimony's probative value outweighed its potential for unfair prejudice.

IX.    <u>*Exclusion of Tyler's Investigator From Defense Table*</u>

Tyler argues that he was unduly prejudiced by the district court's refusal to allow Tyler's investigator to sit at the defense table during trial.  The court excluded the investigator because Tyler planned on calling him to testify.  Federal Rule of Evidence 615 provides:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.  This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party

which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

Tyler contends that the investigator was "essential to the presentation of Tyler's case" because he had worked with Tyler and the defense counsel in sorting through the Government's telephone recordings and could have helped with impeachment efforts based on some of those recordings.

There is no basis for concluding that the district court abused its discretion in determining that the danger of the investigator shaping his testimony based on the testimony of other witnesses outweighed Tyler's need to have the investigator at the defense table. Presumably, the investigator would have helped identify the potentially impeaching recordings prior to trial. There is no reason to doubt the ability of Tyler's counsel to utilize those recordings as needed during the trial.

## X. *Firearm Sentencing Enhancement*

Tyler argues that the district court committed clear error by finding that "a non working, old shot gun with missing parts found in the crawl space in the attic qualified as an enhancement" under section 2D1.1 of the Sentencing Guidelines. The crawl space apparently adjoined the bedroom where Tyler stored drugs.

In applying the firearm enhancement, the "initial burden is on the government to prove possession of the weapon by a preponderance of the

evidence, which may be satisfied by showing mere proximity to the offense."

United States v. Humphrey, 208 F.3d 1190, 1210 (10th Cir. 2000) (internal quotation marks omitted).  The burden then shifts to the defendant to "prove that it is clearly improbable that the weapon was connected to the offense."  Id.

At the sentencing hearing, the district court ruled that Tyler failed to carry his burden of showing that the firearm enhancement was inappropriate:

> [P]ursuant to Section 2D1.1 of the Guidelines, particularly Application Note 3, which cites that this application should be applied unless it is clearly improbable that the weapon was connected with the offense, it is certainly the Defendant's burden to prove otherwise and the Court finds that whether or not the shotgun was working is not known; that there certainly is a sufficient nexus between where the marijuana was found in the home and the location of the gun, even though the gun was upstairs, behind a bedroom door, up in an attic, but that attic was connected to a bedroom where the marijuana was found, both in that bedroom and in the purse of Mrs. Tyler.  The Court finds that this enhancement certainly appears to be warranted.

Tyler insists that the enhancement is inappropriate in light of the example offered by Note 3 of section 2D1.1, which provides that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet."  According to Tyler, the facts of this case mirror the example of the unloaded hunting rifle.

Tyler overlooks the fact that his wife – who provided the only testimony on the issue – stated that she did not know whether the shotgun worked or not. There is no other evidence that the shotgun was unusable, nor is there any indication that the shotgun was intended for recreational use (in contrast to the hunting rifle referenced in the Guidelines' example). And Tyler offers no evidence to counter the district court's conclusion that the shotgun's location was sufficiently connected to the bedroom where Tyler stored drugs. The district court's findings on this issue cannot be considered clearly erroneous. Humphrey, 208 F.3d at 1211 (applying clearly erroneous standard to factual findings underlying firearm enhancement).

## XI.   *Career Offender Sentencing Enhancement*

Collins challenges the district court's finding that he was a career offender for purposes of sentencing. The Sentencing Guidelines provide that a defendant shall be sentenced as a career offender if: "(1) [he] was at least eighteen years old at the time he committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) [he] has at least two prior felony convictions of either a crime of violence or a controlled substances offense." U.S.S.G. § 4B1.1. Collins contends that the third requirement was not met because his previous

burglary conviction does not constitute a crime of violence. "Crime of violence" is defined as an offense punishable by more than one year in prison that:

> (1)     has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (2)     is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2.

The district court relied on a second-degree burglary conviction in Oklahoma state court to classify Collins as a career offender. The only evidence that the offense qualified as a violent crime came in the indictment, which alleged that Collins broke into a person's house. The district court found that Collins "has a conviction for the burglary of a dwelling and that there is sufficient information for this Court that has been made a part of this record to support the enhancement for career offender status."

Collins does not dispute that the indictment alleges a violent crime, but argues that, in light of his subsequent plea bargain, the indictment is not evidence that he was ultimately <u>convicted</u> for a violent crime. He contends that the indictment charged him with both first- and second-degree burglary, but since he ultimately pled guilty only to second-degree burglary, the indictment's factual allegations are irrelevant to determining the nature of the offense for which he was convicted. He also argues that the statutory elements of second-degree

burglary do not qualify as a violent crime. Collins thus contends that the Government failed to carry its burden of proving the applicability of the career offender provision.

"Whether a defendant was erroneously classified as a career offender is a question of law subject to de novo review." United States v. Bennett, 108 F.3d 1315, 1316 (10th Cir. 1997). The Government bears the burden of proving that sentence increases are appropriate, and the career offender provisions are to be interpreted narrowly. Id. "In determining whether a predicate offense qualifies as a crime of violence, courts in this circuit are limited to examining the statutory elements of the crime and the record of the prior proceeding." Id. at 1317.

Collins rests his argument on Bennett, in which the court held that the fact that a defendant was charged with first-degree burglary, which qualifies as a violent crime, does not mean that he was convicted of a violent crime for purposes of career offender status. The court observed that whether a defendant "was charged with a crime of violence . . . is not dispositive for sentencing purposes." Id. Rather, the focus must be placed on the conduct that was the subject of the conviction. Because, like Collins, the defendant in Bennett pled guilty to second-degree burglary – not the first-degree burglary charged in the indictment – the allegations of the indictment were of limited relevance unless the indictment was amended to reflect the allegations to which the defendant pled

guilty.  See id. at 1317-18.  The court observed that, because the record was ambiguous as to whether the indictment was amended, and because the statutory elements of second-degree burglary encompass non-violent forms of burglary, the defendant should not have been sentenced as a career offender.  See id. at 1319.

The Government does not dispute that the indictment charged Collins with first-degree burglary, nor that Collins pled guilty to second-degree burglary. Nevertheless, the Government insists that the indictment's allegations are sufficient to establish the offense's violent nature.  The Government does not attempt to distinguish Bennett from this case, but simply looks to the Bennett court's statement that "charging papers" from the previous conviction could be considered by a sentencing court in determining career offender status.  Id. at 1317.  Under this reasoning, according to the Government, the district court was justified in looking to the first-degree burglary indictment in finding that Collins was convicted of a violent crime.  The Government is only partially correct – as a general rule, courts can look to the indictment as evidence of a crime's violent nature.  But the question here is whether the indictment is even relevant, as it apparently set forth an offense (first-degree burglary) of which Collins was not ultimately convicted.  See United States v. Hill, 131 F.3d 1056, 1061 (D.C. Cir. 1997) ("[W]hen a defendant pleads guilty to a lesser included offense of the offense charged in the indictment and the statutory definition of the lesser offense

- 28 -

allows conviction for conduct that does not meet the definition of a 'crime of violence,' the indictment alone does not provide a sufficient basis for designating an offense a 'crime of violence.'"). The Government implicitly concedes that second-degree burglary is not necessarily a violent crime under Oklahoma law.

The Government has not carried its burden of proving that Collins qualifies as a career offender. The underlying indictment was not included in the record, so we have no way of determining whether the original or superseding indictments alleged – as part of the second-degree burglary charge – that Collins broke into a dwelling. If such an allegation was not included in the second-degree charge, then there is no apparent basis for applying the enhancement to Collins. We therefore vacate Collins's sentence and remand for resentencing.

XII. *Cumulative Error*

Tyler argues that all of the errors discussed above cumulatively deprived him of a fair trial. For the reasons noted above, we find this argument meritless.

**CONCLUSION**

We REMAND with instructions that the district court vacate the sentence of Collins and resentence Collins consistent with this opinion. Collins's and Tyler's convictions and Tyler's sentence are AFFIRMED in all other respects.

Collins's Motion to Supplement Appellant's Brief In Light of the United States Supreme Court's Decision in <u>Apprendi v. New Jersey</u> and <u>Jones v. United States</u> is DENIED.

                                  ENTERED FOR THE COURT


                                  David M. Ebel
                                  Circuit Judge